UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BUGSBY PROPERTY LLC, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. _____ |
| ) | |
| vs. ) | |
| ) | COMPLAINT FOR QUANTUM MERUIT |
| ALEXANDRIA REAL ESTATE EQUITIES, ) | AND UNJUST ENRICHMENT |
| INC. and JOEL S. MARCUS, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## **COMPLAINT**

Plaintiff Bugsby Property LLC ("Bugsby") alleges for its Complaint against
Alexandria Real Estate Equities, Inc. ("ARE") and Joel Marcus (collectively, "Defendants") as
follows:

### **Introduction**

1.      Against the distressed late 2013 backdrop of a prolonged share price
slump and shareholder outrage over executive pay at ARE, Defendants sought help from
Plaintiff. Bugsby created, recommended and provided to Defendants a complete and
fundamental solution to ARE's financial and capital markets approach (the "Bugsby Blueprint").
The Bugsby Blueprint was remarkably prescient and successful, directly leading to ARE's
dramatic long-term resurgence, creating over $13 billion in shareholder value, and saving Joel
Marcus's eight-figure annual pay package and position. Bugsby's work and ideas were taken
willfully, under duplicitous pretenses, and in bad faith. Bugsby was never compensated at all.

2.      In late 2013, ARE was in crisis and distress. Over the prior three years (2010-2013) the company's stock, listed on the New York Stock Exchange ("NYSE"), had produced meager returns to shareholders of 0.54%. The bellwether of closely comparable real estate companies, as reflected in the Vanguard REIT index, generated returns of 47.92% over the same period, outperforming ARE nearly *100-fold*.

3.      Amid this crisis, and with his tenure in jeopardy, ARE's then Chairman and CEO, Joel Marcus, turned to his son Steven Marcus of Bugsby Property LLC for the answer that had eluded him, ARE management, and the company's Board for years. Bugsby's background drew from expertise in equity capital markets, activist shareholding, and long-term knowledge of ARE's business and strategy. It was uniquely placed to understand and diagnose the problem and prescribe the solution.

4.      The Bugsby Blueprint was misappropriated by Joel Marcus and ARE and delivered over $13 billion in wealth creation for ARE's shareholders, long-term share price outperformance, and saved Joel Marcus's position. ARE and its Executive Chairman were and continue to be unjustly enriched at Bugsby's expense. Defendants refused to compensate Bugsby, because Joel Marcus recognized that if Bugsby were compensated he would be unable to take the credit for ARE's turnaround, saving his position and with it, a rich, eight-figure annual compensation package. Furthermore, he concealed the truth about the origins of this resurgence from ARE's board and shareholders to save ARE the $68.7 million dollars properly due in remuneration to Bugsby from ARE. ARE's bold, new strategy was not his idea, but rather Bugsby's.

**<u>The Parties</u>**

5.      Plaintiff Bugsby Property LLC is a single-member limited liability company organized and existing under the laws of Delaware, founded and in operation since 2012, with its registered place of business in New York, NY. Bugsby is an investment manager and real estate sponsor, and its work has been featured in prominent industry publications including *Bloomberg* and *PropertyWeek*.

6.      Bugsby's primary business address is 244 Fifth Avenue, Suite E35 New York, NY 10001. From January 2013 to September 2016, Bugsby had its business address at 220 E. 23rd Street, Suite 809 New York, NY 10010.

7.      Bugsby's sole member is a citizen of France.

8.      ARE is a corporation organized and existing under the laws of Maryland, with its principal place of business in Pasadena, California.  It is one of the country's largest real estate investment trusts, and has significant ownership of real property in New York and major operations of all its businesses in New York.

9.      ARE operates from and owns a major life science cluster location at 430 East 29th Street New York, NY 10016. At this location, ARE owns a group of two buildings and a development site near the NYU Langone Medical Center, with approximately 728,000 rentable square feet in current use and approximately 550,000 square feet under development in ground lease partnership with the New York City Health and Hospitals Corporation and the New York City Economic Development Corporation ("NYCEDC").

10.     In this same New York location, ARE persistently transacts business and provides its real estate development, brokerage and property management goods and services in this district. ARE's Manhattan location's client-tenant leases generate more than $63 million of annual revenue per year (as of 2018 filings). ARE also conducts interstate commerce from this location, soliciting client-tenants from other states to relocate to its New York properties.

11.     ARE operates its *LaunchLabs* NYC incubator service in Manhattan and has announced an expansion of this business with Columbia University for another incubator in New York. In its incubator business, ARE leases space, actively provides goods and services to these companies and takes active ownership stakes in, and board positions at, New York-based portfolio companies.

12.     ARE's venture capital unit, Alexandria Venture Investments, operates out of New York City, offering and investing capital and other services to New York-based

companies. ARE also operates its Seed Capital Platform and Science Hotel in New York and offers investment and related goods and services to New York-based companies in this district.

13.     ARE is, and has been for over a decade, an active and persistent acquirer, developer and operator of New York real property. The company purchased 219 East 42nd Street in Manhattan, consisting of approximately 350,000 rentable square feet for $203 million in July 2018, and 30-02 48th Avenue in Long Island City (Queens County), consisting of approximately 175,000 rentable square feet, for $75 million in October 2018.

14.     ARE persistently conducts and focuses its capital markets activity in New York, NY. ARE has hosted its annual Investor Day, its most important market-facing event and service for its clients, at 430 East 29th Street in Manhattan, NY, every year since 2010.

15.     ARE often holds its quarterly earnings calls from its New York location, communicating publicly with the capital markets, sharing details of its operations and financing, soliciting investment from this district.

16.     ARE frequently and persistently issues and offers equity securities, listed on the NYSE, marketing such securities in New York, such offerings underwritten by major New York based investment banks.  ARE's corporate debt is also consistently underwritten by major New York based investment banks and offered in New York. For example, a $600,000,000 Senior Note offering with a Prospectus dated June 30, 2019 had JP Morgan, Citigroup, Mizuho Securities, and TD Securities, all New York-based, as its joint book-running managers.

17.     ARE and Joel Marcus have made numerous appearances on business television programs broadcast from this district, including *CNBC, Fox Business* and *Bloomberg Television*, soliciting investment capital and advertising its goods and services.

18.     ARE regularly convenes its Board of Directors meetings at 430 East 29th Street address and has also has consistently held official board meetings at the NYSE at 11 Wall Street in lower Manhattan for over 20 years.

19.     Since 2010, ARE annually hosts its 'Summit' industry gathering at the 430 East 29th Street location. This service is provided for and attended widely by ARE clients,

tenants, portfolio companies and industry participants, bringing them all to ARE's New York home. Alexandria Summit, LLC is actively registered to do business in New York State, and has been since September 2010. Its business address is 450 E. 29th Street, New York, NY 10016. ARE is a co-founder and member of Alexandria Summit, LLC.

20.     ARE availed itself of the benefits of this district's laws as a Plaintiff in Case #: 1:11-cv-03694-LTS, Alexandria Real Estate Equities, Inc. vs. William Fair, filed in the US District Court, Southern District of New York on May 31, 2011.

21.     Joel S. Marcus is a United States citizen domiciled in California, and is the Executive Chairman of ARE.

22.     Joel Marcus has systematic and persistent contacts with New York. On information and belief, he spends over 105 days per year in New York City, using the Four Seasons Hotel, at 57 E. 57th Street New York, NY 10022 as a de facto residence. He sits on the board of many New York based companies, holds ownership stakes in New York based companies, and additionally sits on the board of several New York based nonprofit organizations, including the Partnership for New York City, that operate in this district.

23.     Alexandria Summit, LLC is presently registered to do business and has been active in New York State since September 2010. Its business address is 450 E. 29th Street, New York, NY 10016. Joel Marcus is a co-founder and member of Alexandria Summit, LLC.

24.     Joel Marcus has personally contributed nearly $20,000 to New York State and New York City politicians in this judicial district since 2009.

25.     In late 2013, Joel Marcus personally owned real property at Unit Six, 32 N Moore Street, New York, NY 10013. He owned this residential condominium from 2000 in joint tenancy with Steven Marcus, and then from 2012 as one of two members of Unit Six Owners LLC (an LLC with the same two members as the joint tenancy) with this Manhattan condominium as its sole asset. Unit Six LLC's principal office per its operating documents is c/o Gibson Dunn & Crutcher LLP, 200 Park Avenue, 48th Floor, New York, NY 10166. Joel had a

controlling interest of Unit Six Owners LLC, which "engage[d] in ownership, leasing operation and sale" of the Manhattan condominium.

## Jurisdiction and Venue

26.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, as it involves parties of diverse citizenship and the amount in controversy, excluding costs and fees, exceeds $75,000.

27.     This Court has personal jurisdiction over Defendants, because Defendants performed acts and/or consummated a transaction in this jurisdiction; Defendants purposefully availed themselves of the privilege of conducting business in this jurisdiction and invoked the benefits and protections of the law of this jurisdiction; the claims relate in part to Defendants' activities and conduct related to this jurisdiction; and the exercise of personal jurisdiction is reasonable.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the acts or omissions giving rise to the claim occurred here.

29.     Pursuant to Local Rule 18(a), this matter is properly assigned to the Manhattan courthouse.

## Factual Allegations

30.     From 2010 through 2013, ARE was in a downward spiral.  From January 4, 2010 to November 25, 2013, the three years prior to Bugsby's intervention, ARE's stock underperformed the Vanguard REIT Index (VNQ) of closely comparable stocks by (47.38)%. ARE's total common shares during this same period grew from 48,405,040 to 71,081,000, a dilution of nearly 47% (almost exactly in line with the share underperformance).  In an industry that tends to have closely correlated returns, ARE was significantly trailing behind its peers. By the end of 2013, ARE traded at a laggard 15-times earnings while most REIT competitors traded at around 20-times earnings – a massive and persistent discount that would jeopardize any public company's management team.

31.     ARE's September 30, 2013 earnings release revealed that despite growing total income and Funds from Operations ("FFO"), ARE was delivering *declining* results per share to its common equity shareholders.  Despite a growth backdrop, FFO in Q3 2013 was $1.06 per share, having declined by 2% from $1.08 per share from the same quarter in the prior year. Worse yet, ARE's management (led by Defendant Joel Marcus) stubbornly stuck to its failed strategy of focusing on credit ratios to the detriment of per share earnings and returns. As stated in the same earnings report:

> We recognize that often the marketplace has a 'prove it' mindset and many of our decisions may initially result in a decrease in our share price.  Nevertheless, we are committed to our long-term objectives regardless of any resulting short-term pressure on trading price of our common stock.

32.     While investors had begrudgingly tolerated ARE's stagnation during the beginning of this period as the world slowly emerged from the Great Recession, by late 2013 ARE's poor performance could no longer be attributed to a sluggish economy (as the economy and REITs were performing strongly) and could not be justified as a result of prioritizing long-term objectives over short-term pressure.

33.     Indeed, by the middle of 2013, ARE's investors were in open revolt.  In ARE's "Say on Pay" vote, investors sent an unmistakable message about their dissatisfaction. Despite the company's share price stagnation, management was taking home some of the highest compensation packages in the industry.  When put to this Say on Pay vote, management 'failed', as only 9% voted in favor of management's compensation, a sharp decline from the 2012 vote resulting in 80% approval.  The 9% approval vote was a stunning outlier compared to industry and US corporate norms.  By comparison, only seven companies in the S&P 500 'failed' Say on Pay votes that year (*i.e.*, received fewer than 50% of votes for approval), and all those companies failed only by a narrow margin with an average support rate of 44%.  The woeful result for

ARE's management, led by Joel Marcus, left it in the bottom 1% of all publicly-traded companies.

34.     Recognizing an existential threat to his position as Chairman and CEO (and, thus, his eight-figure annual income and stock holdings), Joel Marcus needed help. He was facing pressure from independent board members who wanted to strip his grossly-inflated pay package to appease investors after an unacceptable Say on Pay vote.

35.     Joel Marcus therefore approached Steven Marcus over the 2013 Thanksgiving holiday to request help from Bugsby (of which Steven was and is the Manager). Bugsby would provide advisory services to both Joel Marcus and ARE, with the aim of producing a new capital strategy to improve ARE's share price, satisfy its investors, and save Joel Marcus's position as Chairman and CEO.

36.     Defendant Joel Marcus's decision to request Bugsby's help was prudent. The challenge of operating ARE day-to-day, coming out of the Great Recession, had left a blind spot in Joel Marcus's focus regarding equity appreciation. Despite a long tenure at ARE, Joel Marcus has no formal capital markets training or background. Steven Marcus, in contrast, has a Bachelor's of Science in Finance and Information Systems from The Wharton School, University of Pennsylvania and a Masters of Business Administration in Finance from Columbia Business School. By late 2013, Steven had nearly a decade of experience as a public markets investor and portfolio manager, first at Omega Advisors and JL Advisors and later at two firms where he was the principal, Northmoore Capital LLC and Bugsby. In that role, he had a wealth of experience in capital markets, and often advised management teams as an activist shareholder to re-orient corporate strategy. Steven's prior professional activist engagements included major large-capitalization corporates like Fiat SpA, Research in Motion, Volvo AB, Yahoo Inc., Metso Oyj, Daimler Ag, and Akzo Nobel. His background was filled with an understanding of shareholder perception, corporate strategy and what makes stocks tick. In addition, he was well versed in ARE's business, having worked with the company in the past and followed it publicly since inception.

37.     For example, in late 2008 during the height of the Great Recession, Steven Marcus had advised ARE in a potential take-private transaction called "Project Pharos" by outlining capital structure reforms for ARE and providing key introductions to advisors and sovereign wealth fund investors. The ARE board ultimately decided to keep the company publicly-listed, but the experience set a clear precedent regarding market-based remuneration.  In an email dated November 30, 2008, Defendant Joel Marcus stated:

> I will chat with frederick [Baron, an attorney at Cooley LLP] about whether or not our independent board would consider some sort of remuneration for your introduction of [top Goldman Sachs banker] and his gulf sovereign funds (as well as the gov't of Singapore) in a successful "going private" transaction with either such group.

38.     Further, by late 2013, Bugsby had become well-regarded by private market focused real estate investors and investment bankers – the species of financial investors who had been overlooked by ARE in its day-to-day dealings as a public company. For its own projects, Bugsby was actively interacting with the private real estate capital markets and understood how the market for private capital had rapidly changed.

39.     Bugsby, led by Steven Marcus, was thus uniquely qualified to diagnose the causes of ARE's stagnation and sustained underperformance – familiar enough with capital markets and ARE to be constructive, but not so bogged down by ARE's day-to-day operations to lose sight of ARE's position in the broader public markets. In fact, Bugsby had been watching ARE from the sidelines for a while, so it was well placed to prescribe a timely solution.

40.     Thus, in ARE's and Joel Marcus's desperate hour, Bugsby agreed to provide advisory services to both Joel Marcus and ARE, with the aim of producing a blueprint for a new capital strategy to improve ARE's share price, satisfy its investors, and save Joel Marcus's position and pay as Chairman and CEO.

41.     In late November and December 2013, with the benefit of its long-term knowledge overlay, Bugsby pulled together its views of the causes of ARE's stagnation, and prescribed a cure.  Bugsby contacted the major Wall Street analysts covering ARE, including Michel Bilerman and his team at Citigroup and Ross Smotrich at Barclays Capital and spoke with ARE shareholders.  Additionally, Bugsby performed its own primary research to form independent views of the investment community's consensus and criticisms of ARE's capital markets approach. True to its principal's fund management background, Bugsby was able to quickly assemble a mosaic of primary data points and map them across its prior knowledge into immediately actionable ideas.

42.     After Bugsby's thorough research, the root causes of ARE's stagnation became clear.  ARE's strategy between 2010 and 2013 had focused on maintaining balance sheet leverage ratios at the expense of FFO per share.  The company was issuing dilutive common stock to fund growth rather than using debt or strategic joint ventures and private capital, resulting in persistent share price underperformance. While ARE had solid business fundamentals, its capital strategy resulted in declining earnings per share. 2013 AFFO per share (accounting for stock compensation) *declined* to $4.07 / share from $4.15 / share in 2012.

43.     The issuance of new shares almost directly tracked ARE's significant share price underperformance.  Indeed, ARE returned just 0.54% to investors from January 4, 2010 to November 25, 2013, while the Vanguard REIT Index had returned 47.92% over the same period.  This was equivalent to *$4.5 billion of lost market value for ARE shareholders*.

44.     Bugsby recognized and articulated a compelling way to shift capital strategy to benefit shareholders:  ARE should create a large (hundreds of millions or billions of dollars), programmatic, strategic joint venture with private institutional investors rather than raise capital through share issuance.  This would leverage ARE's core capabilities and lift earnings (FFO) per share, the primary metric analysis and the market used to determine ARE's true value. Bugsby's long-term investment experience informed that earnings per share growth was almost always the most important factor in share performance.



45.    A besieged Joel Marcus invited Steven Marcus of Bugsby to attend ARE's December 4, 2013 Investor Day in New York City. For proximity to the New York capital markets, and because of ARE's NYSE listing and substantial New York presence, this event is held annually at ARE's de facto Manhattan headquarters.

46.    Heading into their presentations that day, Joel Marcus and ARE management were not yet aware of Bugsby's proposed strategy. At the day's annual presentation, Joel Marcus indicated publicly and on the record that ARE intended to continue with its losing strategy of financing new projects through dilutive equity issuances in its misguided effort to maintain long-term credit metrics. The presentation was not well received.

47.    ARE's 2013 Investor Day presentation included *no mention of a strategic joint venture or private investment partnership*. It was clear from the abundant and publicly-available statements and documents from that day that Joel Marcus and incumbent management intended to stubbornly stay with their prior, dilutive equity issuance strategy. ARE delivered guidance with larger-than-expected equity issuance numbers, continuing its dilutive cycle.

48.     Equity analysts remarked in their immediate reaction notes that they were "surprised" to see continued ARE's guidance for large equity issuance of $200 – 300 million (at-the-market common stock offering program) considering its poor stock valuation and the prospect of ongoing dilution and underperformance. Management was stuck in a vicious cycle.

49.     Bugsby's Steven Marcus canvassed the room at the Investor Day meeting in New York, specifically listening to the concerns of analysts, shareholders and investors and sounding out some of its core ideas with them. Many of Bugsby's relationships were long-standing. While ARE was proselytizing the room with its tone-deaf, tired, and losing strategy, Bugsby was gathering vital feedback, refining its main effort to come later in the day.

50.     On the evening of December 4, 2013, at 6:02pm, while both Bugsby and ARE management were both still in New York City following the Investor Day presentation (and before the equity analysts had published their notes), Bugsby emailed Joel Marcus of ARE the outline of the Bugsby Blueprint. The contrast in strategic thinking could not have been more pronounced. As priority number one, Bugsby highlighted: *"strategic jv / co invest partner (250-500 mm) to replace common [stock] issue."*

51.     Bugsby's December 4 email was clear in its diagnosis of ARE's problems and its elegant solution. It clearly and succinctly detailed its powerful plan to replace dilutive common equity with joint venture capital, and to address a broader group of investors to improve shareholder perception and valuation.

52.     Specifically addressing the immense pressure placed by the board and other shareholders on Joel Marcus's tenure, Bugsby's December 4 email also mentioned "board" as a key tenet. Bugsby by this time had begun reaching out to a number of industry luminaries to assist on this front, seeking to add new board members to support the Bugsby Blueprint recommendations and promote Joel Marcus's tenure (and pay package). Bugsby had begun recruiting prospective board members including Michael Fascitelli, former CEO of Vornado Realty Trust, and Peter Linneman of Linneman Associates (and the founder of the American Land Fund and the founding chairman of Wharton's Real Estate Department).

12

53.   By the time the email recommendation was sent, Bugsby also already had started recruiting top-tier, New York-based investment banks to help implement what would become the formal report of the recommendations.  Steven Marcus spoke at length and throughout the month with both Todd Eagle of Goldman Sachs and Steven Mastrovich of JPMorgan (who later moved to UBS), both of whom had been working from New York on institutional capital raises for Bugsby's ongoing principal investment projects.

54.   On December 5, 2013, Bugsby's Steven Marcus met in person with both JPMorgan's Mastrovich and Goldman Sachs's Todd Eagle in New York City, advancing the Bugsby Blueprint from ideas into action. A detailed preview of the Bugsby Blueprint was shared with each, including but not limited to specific recommendations about creating a strategic joint venture. Bugsby began the process of recruiting an investment bank to implement its ideas.

55.   Mastrovich immediately recognized the import of the Bugsby Blueprint recommendations. Fully attributing the ideas to Bugsby's Steven Marcus, Mastrovich started a dialogue with Joel Marcus to specifically gain traction for JPMorgan on implementing the strategic JV / co-investment partner subset of Bugsby's advice for ARE. Meetings to discuss in detail were arranged for December 19 in New York, to be led by Bugsby.

56.   On December 7, 2013, Bugsby sent its recommendation deck outlining the Bugsby Blueprint to select members of ARE's management, including Joel Marcus. Additionally, and unbeknownst to Joel Marcus, Bugsby sent email copies that week directly to Goldman's Eagle and JPMorgan's Mastrovich.  This deck memorialized Bugsby's work, a vast majority of which was performed and delivered in New York. A true and correct copy of that deck, is attached to this Complaint as Exhibit A.

57.   Bugsby's deck unambiguously and uniquely diagnosed the reasons ARE's stock had underperformed its peers as follows:

> "Underperformance since October 2011 – why?
>
> Development pipeline and spending above expectations, which led to,
>
> Equity capital issuance that greatly exceeded sell-side models

Thus, FFO per share missed expectations and decelerated, disappointing the street"

58.     Bugsby's recommendations were clear, concise, and in significant contrast to ARE's existing capital markets strategy. Bugsby advised:

"FFO per share growth;

Remove common stock overhang via Strategic JV;

A "clean" ARE Story;

"Beat and Raise" expectations and;

FFO per share growth isn't everything – it's the only thing!"

59.     Bugsby's primary solution was clear, powerful, and on target:

"What is the solution?

**Strategic Development and Acquisition Joint Venture**

–   A strategic partner will allow ARE to avoid equity issuance

Which seems to be the main driver of underperformance

*Perhaps most importantly, it will remove the overhang, underscore NAV on both the Core and the Development Pipeline – allowing for a true and wholesale revaluation of the stock*"

60.     The Bugsby Blueprint deck was nothing short of a revolution for ARE, and it did indeed lead to a true and wholesale revaluation of the stock. Once Joel Marcus realized the tremendous value of its advice and saw the playbook to improving performance ahead, he and ARE consciously sought to unjustly take credit for Bugsby's ideas and to unfairly deny Bugsby compensation while at the same time progressing its solutions.

61.     As early as December 5, Joel Marcus began attempting to claim that the idea to implement a joint venture strategy going forward was his, not Bugsby's. Mastrovich,

14

however, rebuffed this effort to steal credit, writing that "Steve[n] [Marcus] and I spoke about *his* ideas regarding Alexandria today" (emphasis added).

62.     After reviewing the Bugsby deck, on December 8, Joel Marcus underhandedly reached out to Mr. Mastrovich and told him that the Bugsby Blueprint was "going to be a big thing for ARE!" He clearly indicated the implementation of Bugsby's proposal was a top priority for ARE, yet did not attribute credit to Bugsby despite Mastrovich's knowledge of and earlier receipt of the deck. Joel Marcus did the same with Goldman, emailing Todd Eagle in New York, "When r we meeting rre usa jv capital strategy?"

63.     Thinking that Eagle and Mastrovich would believe the ideas were his, and with Bugsby's playbook in hand, Joel Marcus of ARE sought to cut Bugsby out of the picture. Having promised Bugsby remuneration at the outset, and now with Bugsby's solution delivered, he was looking to dishonestly avoid paying Bugsby its due compensation.

64.     To this day Mastrovich, who helped implement the strategic joint ventures later consummated with TIAA, credits the enormously successful change in ARE's strategy and resulting stock revaluation as "entirely Bugsby's idea."

65.     On December 8, Bugsby proposed the specifics of proposed transactional structures to implement the strategic joint venture / co-investment element of the Bugsby Blueprint to Joel Marcus of ARE. In an email from the same day, it shared: "you would get a management fee and a promote [for a joint venture];" continuing that Bugsby "will work on a structure."

66.     The implementation of the strategic joint venture and co-investment element of the Bugsby Blueprint, by then appropriated and code-named by ARE as "Project Affirmed", continued substantively on December 19, 2013 in New York City. Meetings led by Bugsby's Steven Marcus, and attended by ARE's Joel Marcus, and investment banking teams led by Goldman's Eagle and JPMorgan's Mastrovich, set the course for ARE's rebound.

67.     The December 19 New York meetings were so important to ARE and represented such a large shift in strategy and transactional opportunity that Goldman's Eagle

sought to involve Goldman's now-CEO David Solomon (who missed it only owing to a last-minute scheduling conflict). The JPMorgan meeting of the same day included a full team led by Mastrovich and global real estate investment banking head Tom Grier.

68.     Bugsby's presence and leadership in these meetings was critical, it was asked to lay out its ideas in-person so they could be implemented. The decision was taken by ARE to adopt the Bugsby Blueprint recommendations and actions. This substantial undertaking was made under false pretenses with the expectation of compensation.

69.     The December 19 New York meetings formalized the turning point for ARE. The Bugsby Blueprint was no longer an idea, it had come to life. In these meetings, Bugsby brought its step-by-step plan for ARE, and had specifically recruited the top-tier real estate investment bankers who would ultimately execute the transactions. Bugsby thus initiated and orchestrated ARE's corporate resurgence.

70.     Indeed, by December 21, 2013, Joel Marcus told a full team of ARE executives (including CFO Dean Shigenaga and CIO Peter Moglia (now co-CEO)) and JP Morgan bankers that the ideas delivered by Bugsby had ARE's "highest corporate attention" (again, willfully concealing that they were in fact, Bugsby's ideas).

71.     All of Bugsby's ideas, and the entire Bugsby Blueprint, were conceived of and delivered using only publicly available information and primary research, consistent with its investment management background. The Bugsby Blueprint was developed through years of expertise, and the translation of those into strategy and action took place almost exclusively in New York City. It is also focused on New York's capital markets, players, and their import.

72.     On Bugsby's strong recommendation, ARE hired Mr. Mastrovich and JPMorgan as the investment bankers for Project Affirmed, despite Joel Marcus's reservations that Mr. Mastrovich was a "one-man band." Mr. Mastrovich's New York-based team, later moved to UBS in New York, was appointed as the exclusive financial advisor to ARE for the anticipated deals that would be entered pursuant to the strategy created by Bugsby, and to the transactions eventually completed with TIAA.

73.     Since Project Affirmed was specifically created to implement the strategic joint venture recommendations of the Bugsby Blueprint, it is not surprising that the implementation tracked the advice extremely closely.  For example, on December 26, Bret Perry from JP Morgan circulated its first "Joint Venture Follow-up Discussion Materials", which included (1) a summary of Bugsby's ideas and recommendations from prior conversations and meetings, and (2) a list of potential investors modeled on the list provided by Bugsby in its deck. A revision of that deck, circulated on January 4, 2014, was essentially similar in content to Bugsby's and included many of the same target strategic JV investors, including Oxford Properties (Ontario Municipal Employees Retirement System), ADIA (Abu Dhabi Investment Authority), and Canadian Pension Plan Investment Board (CPPIB).

74.     Bugsby suggested and discussed specifics about the deployment of co-investment or joint venture capital with ARE including potential partners, projects, and how to translate this into stock market gains for ARE stock. Nearly all of these took place in New York, where Bugsby and ARE management met in-person.

75.     The decision to adopt Bugsby's recommendations and to communicate these to the market had an almost immediate impact on ARE's share performance, its stock reflecting future expectations for financing. ARE was especially quick to tout the strategic joint venture tenets of the Bugsby Blueprint in its investor communications.

76.     By December 31, 2013, ARE had completed its about-face in capital markets policy. In its year end 8-K Earnings Press Release and Supplemental, dated just four weeks after receiving the Bugsby Blueprint, ARE said (parroting Bugsby's advice) : "*we anticipate financing these [development] projects with joint venture capital.*"

77.     On January 24, 2013, ARE signed a mutual nondisclosure agreement with a New York-based JPMorgan affiliate (Mastrovich's team) to begin the implementation of the strategic joint venture transactions as advised by Bugsby.

78.     At Citi's 2014 Global Property CEO Conference in early March 2014, a high-profile forum for REIT shareholders, Joel Marcus made clear that adopting the Bugsby

Blueprint to lift ARE's share price was a top priority (despite not giving Bugsby credit or fair remuneration).  The mere announcement that ARE was considering a strategic joint venture and co-investment strategy as prescribed by Bugsby was very well received.

79.    In a note covering the conference on March 3, 2014 Michael Bilerman from Citi Equity Research praised exactly this strategy, lifted from the Bugsby Blueprint:

> "ARE's CEO, Joel Marcus, commented that the most misunderstood
> aspect about ARE is its capital allocation.  Mgmt [management]
> recognizes that it did have some difficulty with capital allocation and
> have been working to correct that … ARE views land as an
> opp[ortunity] to grow the company and could potentially do so through
> a joint venture agreement to create value without increasing share
> count."

80.    On March 28, 2014, ARE management and JPMorgan's team met with all top senior executives from Canada Pension Plan Investment Board (CPPIB), one of Bugsby's recommended co-investment partners, in Toronto. ARE and CPPIB entered into a non-disclosure agreement in May 2014, advancing a joint venture term sheet which was in advanced negotiations by June 2014.

81.    The announcement of replacing common stock issuance with a joint venture or co-investment partner had an immediate and clear effect on ARE's market perception. Its share price had improved dramatically after the announcement, adoption and initial implementation of the Bugsby Blueprint, reflecting the anticipated multiple expansion. A March 31, 2014 research note from Citi highlighted the improved performance based on the changed capital allocation strategy as follows:

> "Shares of life science focused REIT Alexandria (ARE) are up over
> 15% year-to-date and up over 21% since its mid-December low,
> following a series of positive steps and management demonstrating

> their ability to grow the company while at the same time practicing
>
> sound balance sheet and capital stewardship . . . . JVs planned for 2014
>
> have yet to be announced."

82.     After six months of sustained improvement in share price performance on the basis of the Bugsby Blueprint, and even before any of the joint venture transactions had been executed, Joel Marcus sent Steven Marcus an email thanking him for Bugsby's work, saying: "Thank you for your advice."

83.     Through the end of 2014, the CPPIB inexplicably stalled, and Mastrovich then moved his team to UBS's 1285 Avenue of the Americas New York offices. The Project Affirmed effort was continued in 2015 with TIAA, headquartered and domiciled in Manhattan, NY, taking the lead in a short-list process. Many of the key negotiations in the TIAA transactions occurred in this district, as well.

84.     The promise of joint venture capital continued to aid ARE's share price revaluation, exactly as Bugsby had instructed. Following a late 2014 presentation from Joel Marcus and management, New York-based Evercore ISI wrote a note that followed Bugsby's prescient advice, a year after the Bugsby Blueprint was delivered:

> "ARE management articulated its near term commitment for 2015 to fund
>
> outlined development without tapping the equity markets.
>
> ARE has a much more conservative approach to development (pipeline over
>
> 85% pre-leased), and joint venture capital will be a source of funds. We expect
>
> a premium valuation will once again emerge for ARE shares."

85.     Eventually, ARE partnered with TIAA in a program of joint ventures (sometimes described in filings as sale of minority interests with management agreements) that formed the transactional climax of Project Affirmed. Between 2015 and 2017, ARE and TIAA partnered on the following projects, totaling over $1.2 billion in asset value, with New York based UBS (led by Mastrovich) named as sole and exclusive financial advisor:

- 70% interest in 225 Binney Street, Cambridge MA for $190.1 million

- 40% interest in 409/499 Illinois Street, San Francisco, CA for $189.6 million

- 49.9% interest in 1500 Owens Street, San Francisco, CA for $73.4 million

- 45% interest in 10290 Campus Point Drive, San Diego, CA for $84.3 million

- 45% interest in 10300 Campus Point Drive, San Diego, CA for $150.0 million

- 49.9% interest in 9625 Towne Centre Drive, San Diego, CA for $18.76 million
  (a development asset and partnership)

86.     Further strategic joint ventures continue to be pursued actively by ARE, positively impacting its climbing stock price and enriching the company at Bugsby's expense. In August 2019, ARE completed the sale of a 49% (joint venture) interest in 5200 Illumina Way, a Class A campus and development in the University Town Center submarket of San Diego for a total sales price of $286.7 million.

87.     The Bugsby Blueprint has unjustly provided enormous benefits to ARE (and thus to its then-CEO, now Executive Chairman, who retained his enormous pay package because of it).  After ARE accepted and began implementation of Bugsby's advice to radically alter its strategy from focusing on Balance Sheet / Leverage Ratios to focusing on FFO (Earnings) Per Share Growth, with the benefit of joint venture capital, the improvement in price per share stock performance was dramatic and sustained.

88.     ARE continues to benefit from the Bugsby Blueprint to this day, and uses Bugsby's advice in its annual Investor Day presentations (presented annually since 2014 in New York City to promote its stock), and in its quarterly earnings updates. The core tenets that Bugsby discovered and explained in late 2013 remain prolific, long-term winners.

89.     Notwithstanding the enormous benefits provided, Bugsby was never compensated for the Bugsby Blueprint. Bugsby has been responsible for unlocking the change in strategic direction that was critical to ARE's subsequent successes, and the ensuing benefits to ARE, its shareholders, and its then-CEO, now Executive Chairman Joel Marcus.

90.     Based on ARE's most recent 10-Q filing from June 30, 2019, its total

shares outstanding are 113,417,511. On October 9, 2019, ARE's NYSE-listed shares closed at a

price of $154.35 per share. ARE's current equity market capitalization is $17,505,992,823. On

December 4, 2013, ARE shares closed at $62.32 per share, and per the period's 10-Q, there were

71,627,655 shares outstanding, for an equity market capitalization of $4,463,835,459. On the

back of the Bugsby Blueprint, and owing to its advice, <u>ARE has grown its market value by</u>

<u>$13,042,157,363</u>:



91.     Joel Marcus and ARE's willful and conscious intent to unjustly enrich

themselves at Bugsby's expense seems to be best summarized in email exchanges from

December 19, 2013 (with both parties and the relevant bankers all in Manhattan, New York).

When Bugsby circulated the December 7 Bugsby Blueprint recommendation deck to the

JPMorgan team, properly marked as having been authored by <u>Bugsby Property LLC</u> (copied to

Joel Marcus of ARE), Joel Marcus swiftly and privately emailed Bugsby's Steven Marcus

demanding that he **"remove Bugsby stuff"** from the recommendation deck. Joel Marcus

impatiently followed up that same day with several additional emails reiterating the demand, including as an example one such email saying:

> "pls don't use bugsby on stuff with me and don't send materials to the [external] teams unless I ask – I would have preferred you not send them the slides  . . . let me take it from here"

92.     Joel Marcus's motive has been to falsely purport to that the Bugsby Blueprint, advice that was then implemented in Project Affirmed and the TIAA joint ventures – the advice that saved his job, pay package and fueled ARE's share price takeoff – was created by him, the CEO who had failed to change strategy throughout at least three years of massive underperformance. In fact, it was Bugsby who delivered the solution.

93.     In ARE's proxy statements, the primary justification of its board's remuneration of Joel Marcus is crediting him for "raising capital and further strengthening our long-term capital structure." Another key compensation decision factor is listed as "actively communicating on a regular basis with investors and analysts." This and other Proxy citations clearly indicate his personal unjust enrichment at Bugsby's expense.

94.     ARE's 2018 Proxy Statement unjustly attributes the Bugsby strategic plan as implemented in the TIAA joint ventures to Joel Marcus, and uses this to justify his compensation package:

> "In 2015, Mr. [Joel] Marcus established an important relationship with a high-quality institutional investor [TIAA], which allowed us to generate approximately $736 million during 2015-2017 through the sales of partial interests in eight properties. These sales allowed us to raise strategic capital at an attractive cost to fund the growth of our business."

95.     In 2018 alone, as reported in ARE's 2018 Proxy Statement, Joel Marcus received $12,243,060 in total compensation. As admitted by ARE itself: "the ratio of the annual

total compensation of our CEO to the median of the annual total compensation of all employees other than the CEO was 86 to 1."

96.     Owing to Bugsby's rescue, Joel Marcus has received annual compensation (per ARE's SEC filings):

> 2014: $11,005,375
> 2015: $11,224,090
> 2016: $11,307,499
> 2017: $12,243,080
> 2018: $11,806,797

His total personal remuneration, including 2019, from ARE since soliciting and receiving the Bugsby Blueprint, allowing him to retain his executive position, of nearly $70,000,000.

97.     According to SEC Form 4 filings, Joel Marcus has been a prolific seller of ARE stock in the open market. Having been lavishly rewarded with stock grants for unfairly taking credit for Bugsby's role in turning ARE around, and while selling ARE stock to investors, he owns fewer shares today than in December 2013, and has realized $79,926,695 of insider sales in the time since (the bulk of these sales coming after the TIAA deals were closed).

98.     Bugsby is rightly entitled to its due consideration for creating and authoring the Bugsby Blueprint, having generated over $13 billion of dollars in wealth for ARE's investors and personally enriching its management.  Bugsby was told that it would be compensated for such work, yet ARE and Joel Marcus reneged on a promise to provide what was due.  In fact, Joel Marcus has sought to take Bugsby's work and to pass it off as his own. Consequently, ARE and Joel Marcus have unjustly received something of tremendous and long-term value for nothing, all at the expense of Bugsby's immensely valuable ideas and advice.

## First Cause of Action – Quantum Meruit (against ARE)

99.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

100.     Plaintiff Bugsby fully performed the services alleged herein on behalf of and at the request of Defendant ARE, and did so in good faith. Based upon the expertise deployed and the results achieved, the value of those services exceeds $68.7 million.

101.     Bugsby performed the services with the expectation of compensation in exchange for the services.

102.     ARE accepted and benefitted from the services performed by Bugsby, but failed to pay Bugsby the reasonable value of those services, or in fact any compensation at all.

103.     Plaintiff Bugsby is therefore entitled to the reasonable fair market value of its services in an amount to be determined at trial, reasonably expected to exceed $68.7 million.

## Second Cause of Action – Quantum Meruit (against Joel Marcus)

104.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

105.     Plaintiff Bugsby fully performed the services alleged herein on behalf of and at the request of Defendant Joel Marcus, and did so in good faith.  Based upon the expertise deployed and the results achieved, the value of those services exceeds $33.6 million.

106.     Bugsby performed the services with the expectation of compensation in exchange for the services.

107.     Joel Marcus accepted and benefitted from the services performed by Bugsby, but failed to pay Bugsby the reasonable value of those services, or in fact any compensation at all.

108.     Plaintiff Bugsby is therefore entitled to the reasonable value of its services in an amount to be determined at trial, reasonably expected to exceed $33.6 million.

## **PRAYER**

Wherefore, Plaintiff prays judgment against Defendant as follows:

1.      for compensatory damages in an amount to be determined at trial;

2.      for prejudgment interest as permitted by law;

3.      for postjudgment interest as permitted by law;

4.      for costs of suit; and

5.      for such other relief as the Court may deem proper.


Respectfully submitted,

Dated:  October 8, 2019

*s/  Richard J. Mooney_____*
 Richard J. Mooney (*pro hac vice* anticipated)
 richard.mooney@rjmlitigation.com
 **RJM Litigation Group**
 505 Montgomery St. #1100
 San Francisco, CA 94111
 Telephone:   (415) 307-3021

*Attorneys for Plaintiff Bugsby Property LLC*

## **Demand for Jury Trial**

Plaintiff requests a trial by jury for all issues in this action triable to a jury.

Dated:  October 8, 2019

Respectfully submitted,

*s/  Richard J. Mooney*_____
Richard J. Mooney (*pro hac vice* anticipated)
richard.mooney@rjmlitigation.com
**RJM Litigation Group**
505 Montgomery St. #1100
San Francisco, CA 94111
Telephone:   (415) 307-3021

*Attorneys for Plaintiff Bugsby Property LLC*

# ARE Capital Markets Analysis and Recommendations – DRAFT

December 7, 2013

Bugsby Property LLC – Steven Marcus

Highly Confidential

Exhibit A

# 2013 Investor Day Feedback – Citi & ISI

- **Can Solid Business Trends be Enough of a Catalyst?** —The tone at Alexandria's NY Investor Day today was quite positive as business trends are moving in the right direction, the Biotech industry remains strong, assets values remain robust, and the company's balance sheet is finally in good shape; however this was offset somewhat by share underperformance and guidance that was below the Street and Citi's expectations. The core portfolio continues to hold up with SSNOI expected to be up 4-6% on a Cash basis (2-4% GAAP) driven by both rate and occupancy growth. With things moving in the right direction Investors now wonder if a solid portfolio and operating model within a growth industry is enough of a catalyst to make shares work. Recent positive announcements haven't served to propel shares and we wonder if staying the course and even exceeding a conservative guidance number will provide fuel for the stock. Valuation remains attractive at a 6.7% implied cap rate and we maintain our Buy rating.

**ISI – *Continue to see ARE as a low multiple stock with low expectations*; Maintain Buy** - As noted above, we expect ARE can execute on the '14 business plan which is largely based on modest lease-up of the portfolio (+10-20bp in North America) coupled with the build out and continued lease up of the existing development portfolio.  *With the stock trading at just 15x our '14 AFFO estimate (**5 turns below the REIT sector average**) the stock remains an interesting play in 2014 if the company can **move earnings higher** throughout the year.*

# 2013 Investor Day Feedback - Citi

- **Setting up to Beat, we Hope** — ARE's $4.60-4.80 2014 FFO guidance fell short of analyst expectations (at $4.73) with management openly talking about setting a low bar which is easier to beat. Mgmt commented that the mid-point ($4.70) is the internal target to beat. We are disappointed that mgmt introduced a range that would be easier to beat, rather than realistic and accurate, but do believe that the goal was to put out a conservative number. Some of the significant drivers of the lower than expected FFO guidance are an earlier ~$400m bond issuance and large ~$250m ATM issuance. The Street is likely to stay near their current $4.73 estimate following today's commentary. We are holding off on updating our model until we get more clarity from management on certain items. In any case, earnings growth in 2014 and 2015 should continue to be robust.

- **No Common Equity, Please** — We were surprised to see ARE include $200-300m of ATM common equity in their 2014 numbers, especially with shares currently trading below levels at which management would feel comfortable issuing shares. We would rather see ARE do a JV and/or sell some of their stabilized assets given attractive market cap rates and demand. A JV, especially with an institutional partner, would allow ARE to raise attractively priced capital as well as maintain ownership and management in the assets.

- **Biotech Industry Remains Strong** — Life science industry fundamentals continue to benefit from solid R&D funding and FDA drug approvals at all-time highs. The NASDAQ Biotech Index has outperformed over the last 8 quarters and the IPO market is the strongest it has been in over a decade. Eli Lilly's CEO, Chairman and President John C. Lechleiter, PhD spoke about the industry moving to FIPNet where collaboration plays a much larger role and fits well into the Cluster market approach.

# ARE vs. REIT index - 5 year relative performance



# ARE vs. REIT index – 2 year relative performance



# Underperformance since October 2012 – why?

- Development pipeline and spending above expectations, which led to …
- Equity capital issuance that greatly exceeded sell-side models
- Thus, FFO per share missed expectations and decelerated, disappointing the street
- Creating a dynamic where ARE became a 'show-me' stock vs. an industry darling

# REIT Indexing – self-fulfilling and reinforcing

**Wilshire REIT Weighting**
The indexes are weighted by float-adjusted
market capitalization.

• *Leaders stay leaders, laggards stay laggards*

• *as stock performance improves, index funds are forced
to buy …*

•*I f the goal is to grow the float but not issue shares –
price must appreciate!*

• *Most REIT investors (and most of the ARE current share
register) are index funds or trackers*

• *While it would be ideal to attract new shareholders, it
would also be good to drive incremental demand from
current ones*

# What does the public market want to see?

- **FFO per share growth** – this should be easily achievable given the Core / same-store trends and development pipeline

- **Remove common stock overhang** – fund development growth with ability to access attractive debt markets and externally via Strategic JV, *will also boost per share metrics!*

  *(investor day models have 2014 $250 mm common issuance at low $60's, which would clearly limit incremental buying)*

- **A 'clean' ARE story** – public markets are more appreciative of the Core, a pure-play REIT dominant in its niche – and public markets undervalue development and value-add potential

  – No need to sell core assets – the Core will be revalued as obstacles to NAV parity / multiple expansion are removed

- **'Beat and raise'** – for better or for worse, premium valuations are bestowed upon REITs that can exceed expectations

# Where would a 'clean' core-focused ARE trade?

Core 2014E FFO = $335-349 mm *(citi & ISI estimates)*

Core 2015E FFO = $375-392 mm

Shares Outstanding = 71.63 mm (9/30/13 10-Q)

*Assuming no equity issuance, all growth funded by debt & JV*

2014E FFO per share = $4.68 – 4.87 *(7 – 11% growth)*

2015E FFO per share = $5.24 – 5.47 *(11 – 16% growth)*

At a normalized or premium FFO multiple of 18 - 20x:

**18x $4.70 = $84.60 (2014 target) –** *36% upside*

**20x $4.70 = $94.00 (2014 upside) –** *52% upside*

**18x $5.30 = $95.40 (2015 target) –** *54% upside*

**20x $5.30 = $106.00 (2015 target) –** *71% upside*

*The public markets will pay a premium for focused double-digit and accelerating growth!*

# Public market has its limitations

What do the public markets do a poor job of valuing?

- **Development and acquisition pipeline** – value-add opportunities are undervalued and create a drag on multiples (see ISI analysis below: forward NAV < current NAV)

| *Our result is...* | |
|---|---|
| Net Asset Value Per Share | $67.64 |
| Fwrd Net Asset Value Per Share | $63.20 |

- **Brand Value and Operations** - Specialized know-how, operational excellence, market presence in a valuable niche



- **International Operations and Opportunities** – this is not something to be overlooked, as public, private and financial entities abroad are eager to acquire life science expertise

# What is the solution?

*Doing nothing on the capital markets front will likely lead to continued underperformance, despite positive FFO trends*

- **Strategic Development and Acquisition Joint Venture**
  - A strategic partner will allow ARE to avoid equity issuance which seems to be the main driver of underperformance
  - It will also broaden rather than limit the opportunity set for a value-creating development and acquisitions team
  - Will send a powerful signal to the market that the strategy has value and can underscore land value, while pulling it away from the Core
  - Would continue to widen the moat that ARE has over its peers in the marketplace, as it would remove some restrictions on deal underwriting and capital constraints

*Perhaps most importantly, it will remove the overhang, underscore NAV on both the Core and the Development Pipeline – allowing for a true and wholesale revaluation of the stock*

# Who are the potential JV partners?

























# What is the solution?

**secondarily:**

- **International Licensing Operation / further JV's or an extension of the primary JV** – ARE's overseas investments are undervalued by the Street, meanwhile there is a big opportunity to create value – but it must be done off balance sheet!

- **IR Staffing** – perhaps it would make sense to hire an internal head of Investor Relations to continue to help a) change the narrative and highlight the 'new' story, and b) to make inroads into new public investor pools

# Peter Guber, 'Tell to Win' – the ARE version

- **Capture your audience's attention quickly and keep it** – the JV will allow for management to open up a 'transformational narrative' and tell a new story

- **Motivate your listeners (or shareholders) by being authentic** – this is merely accentuating the operational excellence and value intrinsic in ARE, validating strategy

- **Build your 'Tell' around what's in it for them** – FFO growth, better multiple, higher share of index, momentum begets more momentum (in a word – TSR)

- **Change passive listeners into active participants** – make every holder or non-holder re-evaluate why ARE is unique

- **State of the HEART** – go back to being a 'special story' and focus on active managers vs. index funds